# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **STEVEN C. HEATON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **8:06CV2** |
| | ) | |
| **JOHN POTTER, POSTMASTER** | ) | **MEMORANDUM AND ORDER** |
| **GENERAL UNITED STATES** | ) | |
| **POSTAL SERVICE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the magistrate judge pursuant to 28 U.S.C. § 636 and the consent of the parties on the defendant's Motion for Summary Judgment (Filing 58) and the plaintiff's responsive Motion for Summary Judgment (Filing 64).

Plaintiff, who is proceeding *pro se*, is an employee of the United States Postal Service ("Postal Service"). The operative complaint is plaintiff's Second Amended Complaint (Filing 53), in which he alleges the Postal Service committed acts of unlawful retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 *et seq*. ("Title VII"); the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq*.; and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*. ("FMLA") by

1. Forcing the Plaintiff into a rehabilitation job assignment in a known hostile work environment and subjecting him to that hostile work environment from November 2001 to January of 2003.

2. Interfering with the Plaintiff's rights under the FMLA ... by denying his return to work on the 6th of January 2003 in spite of a proper medical release and the clearly defined rights of the Plaintiff under the FMLA.

3.    Calculating the indebtedness of disabled employees, including the Plaintiff, differently than the indebtedness of other employees.

4.    Issuing a letter of warning that was integral to the removal of the Plaintiff from employment and/or monetary discipline of the Plaintiff based on an incident that was clearly caused by the negligence of Postal management.

5.    Denying the Plaintiff immediate continuation of pay in violation of the Workers' Compensation Act based on the interference by Postal management in the rights of the Plaintiff under the FMLA.

(Filing 53, Second Amended Complaint at pp. 1-2).

For the reasons stated herein, the court finds that summary judgment should be granted in favor of the Postal Service and against the plaintiff in all respects.

## I.  JURISDICTION AND VENUE

This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Venue in this district is proper under 28 U.S.C. § 1391.

## II.  FINDINGS OF FACT

The court finds that the following facts are uncontroverted for purposes of the parties' motions for summary judgment and constitute the material facts upon which a resolution of the issues must be premised.

1.    Plaintiff started working at the Postal Service as a letter carrier in 1996.

2.    On November 9, 1999, plaintiff suffered a back injury while working for the Postal Service at the Ames Station.  He has been under work restrictions ever since.

3.    On or about November 15, 1999, plaintiff filed a claim for benefits under the Federal Employees' Compensation Act (FECA) for the November 9, 1999 on-the-job injury with the

-2-

Department of Labor Office of Workers' Compensation Program (OWCP).  The OWCP accepted

plaintiff's claim and granted him Continuation of Pay (COP)[1] benefits.

4.      On or about June 6, 2000, plaintiff filed a FECA claim for compensation alleging that

he stood too long on his feet on May 30, 2000.  The Postal Service preliminarily issued plaintiff COP

benefits.  The OWCP later denied plaintiff's claim because the evidence submitted did not establish

that he sustained an injury as alleged.  Plaintiff did not appeal this determination and his COP hours

were eventually converted to sick leave in lieu of his repaying the COP benefits.

5.      In 2001, as required by the OWCP guidelines,[2] plaintiff began working in the Central

Forwarding System (sometimes called the Computerized Forwarding System) unit (CFS Unit) in

Omaha, Nebraska on a part-time basis because the CFS Unit could accommodate his medical

restrictions.  The CFS unit consisted of approximately 30 employees.

6.      On or about June 18, 2001, plaintiff was offered a permanent position in the CFS unit

as a modified clerk.  Because the CFS Unit needed employees, plaintiff was offered preferential days

---

[1]COP is the continuation of an employee's regular pay for up to 45 calendar days of wage loss due to disability and/or medical treatment.  It is paid by the employer only in connection with a traumatic injury.  The OWCP, not the Postal Service, makes the determination whether an employee is titled to COP.  If COP is claimed, the employer must continue the employee's pay unless it controverts COP for specific designated reasons.  The employer may also stop or reinstate COP under certain circumstances.  The employee cannot be required to use annual leave or sick leave if the employee suffers a traumatic injury.  If COP is controverted and terminated, the employee may either use leave or take leave without pay and apply for compensation.  COP is paid as salary and is subject to the usual payroll deductions.  The amount of compensation is paid at 2/3 of the employee's pay rate if the employee has no dependents, or 3/4 of the pay rate if the employee is married or has one or more dependents.  (Doc. 60-2, Burmeister Decl. at ¶¶ 2-3; Doc. 60-3, Explanation of OWCP Guidelines).

[2]Under the OWCP Guidelines, if an employee's "Duty Status Report" (Form CA-17) shows that the employee can return to light or limited duty before the 45-day COP period ends, the employee must return to duty.  If the employee refuses to accept the work offered or fails to respond to the job offered, the employer may end COP effective the date that the light duty work became available.  (Doc. 60-3).

-3-

off and preferential hours.  At that time, and at all times relevant to plaintiff's complaint, Traci Higginbotham ("Manager Higginbotham") was the Acting Manager of the CFS Unit.  Plaintiff reported to either Manager Higginbotham or an Acting Supervisor.  Plaintiff accepted this offer on November 9, 2001, at which time his COP for the 1999 injury was terminated.

7.    Manager Higginbotham was aware of plaintiff's prior EEO activity when plaintiff worked part-time in the CFS unit.  Plaintiff informed Manager Higginbotham that he had filed previous EEO complaints regarding employees at the Ames Station.  Additionally, plaintiff received calls from EEO counselors and requested time to work on EEO matters.  Manager Higginbotham was well aware of plaintiff's previous EEO activity when he was offered the full time modified clerk position.

8.    On or about March 20, 2002, plaintiff submitted the required OWCP paperwork to buy back[3] intermittent leave taken from 1/13/00 - 6/13/00.  As required by OWCP procedures, the Postal Service's Injury Compensation Office provided plaintiff with an estimate of what it would cost him to buy back the indicated leave.  This estimation was calculated using the compensation rate established by the OWCP of 2/3 for single employees.  Plaintiff disagreed with the estimate and wrote a letter to the Injury Compensation Specialist, threatening to file criminal charges against him and the USPS.  A revised estimate was provided by the Injury Compensation Office.  After plaintiff signed off on the estimate, it was sent to the OWCP for final calculations and a determination.  The

---

[3]Under the OWCP Guidelines, an employee can "buy back" annual leave used as the result of an on-the-job injury if the claim is approved and medical evidence shows that the employee was unable to work because of the injury during the period claimed.  The decision to grant or deny a buy-back request is solely that of the employer.

OWCP eventually notified plaintiff that his application to buy back leave had been approved for 1/3/00 - 6/13/00 and that OWCP would pay $1716.25 of the cost to buy back the leave.

9.      On or about May 21, 2002, plaintiff filed a FECA claim for recurrence based on his 1999 injury with the OWCP, claiming that a diagnosed condition of fecal incontinence related back to his 1999 back injury.  The OWCP denied his claim.  The denial was upheld on appeal because the evidence did not support a causal relationship between his accepted condition and the fecal incontinence condition.

10.      Shortly after plaintiff began working in the CFS unit on a permanent basis, Manager Higginbotham began receiving complaints from plaintiff and about plaintiff with some regularity. Manager Higginbotham recalled the following incidents:

        a.      Employees Shari Aken and Laura Albers complained on several occasions that plaintiff was violating his medical restrictions.  Manager Higginbotham told Ms. Aken and Ms. Albers that they needed to stop watching plaintiff and worry about themselves.

        b.      One of plaintiff's responsibilities was to provide address corrections to mailers. Plaintiff complained that a number of employees were sabotaging his job by placing labels on magazines in a manner that slowed his productivity.  Manager Higginbotham conducted quality checks of plaintiff's mail every morning.  She found that the labels were misapplied by different employees and talked to each employee.  She concluded the acts were not deliberate and were more likely the result of a fast-paced work environment and the pressure to increase productivity.  Plaintiff continued to complain about the labels; therefore, in November 2002 Manager Higginbotham held a Service Talk for all employees and

established a set procedure to position the labels so they would always be applied the same way. Plaintiff later complained about this method. Manager Higginbotham took the production of the unit as a whole into account and ultimately decided to leave the procedure in place and provide assistance to plaintiff when needed to reapply the labels.

c.    Plaintiff further complained that other workers were stepping out in front of him in the aisles as a deliberate act to cut him off as he walked from one area to another. Manager Higginbotham spoke to the employees, who denied intentionally stepping out in front of plaintiff. She still told the employees that such conduct would not be tolerated and they should be more courteous. She also tried to schedule daily work assignments so as to keep plaintiff and the other employees in separate work areas.

d.    On August 5, 2002, Manager Higginbotham brought plaintiff and Ms. Aken into the office with a union steward present. Higginbotham told both of them that they have had personal differences with one another for some time and it was interfering with the effectiveness of the unit. She told them they were not to talk to one another or go by one another and if they had problems in performing their assigned tasks, they should bring it to the supervisor's attention.

e.    Even after the August 5, 2002, meeting, plaintiff and Shari Aken continued to complain about each other.

f.    Plaintiff also continued to have conflicts with Aken, Albers, and other employees.

-6-

11.    In May 2002, Ray Zarkoskie ("Supervisor Zarkoskie") became the Acting Supervisor for Tour 3 of the CFS unit.  From that time forward, both Manager Higginbotham and Supervisor Zarkoskie directly supervised plaintiff during the times relevant to plaintiff's complaint.

12.    Some time after coming to the CFS unit in May 2002, Supervisor Zarkoskie became aware that plaintiff had engaged in some sort of prior EEO activity because plaintiff requested time to work on his EEO matters while working in the CFS unit. The fact that plaintiff was involved in prior EEO matters was not a concern to Supervisor Zarkoskie and was not a factor in any decisions he made with regards to plaintiff or his work assignments.

13.    When Supervisor Zarkoskie started in May 2002, it was apparent to him that two "groups" existed within the CFS unit and were pitted against each other, creating a childish and petty atmosphere that resulted in decreased productivity because the supervisors and the manager were regularly being called upon to address personality and interpersonal conflicts.

14.    On or about November 25, 2002, Manager Higginbotham informed plaintiff that he would no longer be required to sweep the machines for the 3547 mail and the 3579 mail and arranged for another employee to take over those duties.  This action was taken in response to complaints made about plaintiff being in other employees' work space.

15.    On or about December 6, 2002, plaintiff submitted a Continuation of Pay ("COP") form, which stated, among other things, that he was "unable to work for fear of doing harm to one or more of my fellow employees."  This form was received by another Acting Supervisor, John Morse ("Supervisor Morse") who contacted Manager Higginbotham after he received the claim. The OWCP eventually denied plaintiff's claim because plaintiff failed to provide medical evidence that

he was disabled from his limited duty position due to the previously accepted work-related condition. Plaintiff did not appeal this denial.

16.    Manager Higginbotham determined that plaintiff's statement on the COP form fell under the Postal Service's Zero Tolerance Policy, which states: "any employee who makes a threat of physical violence against himself/herself or others will be taken seriously, and the threat will be dealt with immediately and effectively." The Policy directs that the official in charge "place the employee in an off-duty status and instruct the employee not to return to work until notified by management." The Policy further states that threats are serious offenses and that removal is normally warranted.

17.    As a result of plaintiff's statement and the Zero Tolerance Policy, Supervisor Morse, after consulting with Manager Higginbotham, placed plaintiff in Emergency Placement, Off-Duty Status on December 6, 2002, and notified him that he was not to report to work or be on postal premises.

18.    On or about December 12, 2002, Manager Higginbotham sent plaintiff a letter requesting that he attend a meeting on December 16, 2002, to discuss the statement he made on his COP form. Plaintiff attended the meeting on December 16, 2002.

19.    On or about December 19, 2002, plaintiff was notified that the medical documentation he provided on December 16, 2002 demonstrated that plaintiff could not return to work at that time. Since plaintiff was claiming a medical related reason for not being fit to work, he was required to contact the RMS office on a daily basis to report his absence from work. He would not be allowed to return to work until his physician had released him and completed a return to work form. Upon

receipt and review of the completed form, the medical staff would advise Higginbotham of when plaintiff had been cleared by them to return to work.

20.    Based solely on his physical condition, plaintiff was scheduled to come back to work on January 6, 2003; however, he still needed approval from the Postal Service Occupational Health Nurse Administrator (OHNA) before returning to work.

21.    On January 6, 2003, plaintiff was sent a letter reminding him that the Postal Service needed a return to work filled out by Dr. Mary Ann Strider, that this form needed to be sent to the OHNA, and that he could not report to work until he was cleared to return to work.  The letter also reflects that plaintiff had not provided written authorization for the Postal Service to contact his physicians regarding the information he submitted with his December 6, 2002 application for COP, although he had agreed to provide such authorization during the December 16, 2007 meeting.

22.    On or about January 16, 2003, Ann Tholen, OHNA, notified plaintiff that she received a return to work form from Kimberly A. Plummer, CMSW on January 9, 2003, releasing plaintiff to return to work on January 8, 2003.   However, that form needed to be co-signed by a physician/psychiatrist due to plaintiff's Emergency Placement, Off-Duty Status imposed because of plaintiff's assertion that he was "unable to work for fear of doing harm to one or more of my fellow employees."  Ms. Tholen was unable to release plaintiff to work until the required signatures were provided.  The January 16, 2003 letter further advised the plaintiff:  "Additionally, we are unable to release you to return to work until I have your authorization to speak with the physician and also receive the release signed by your psychiatrist so we can be sure he/she understands our concerns."

23.    On or about January 17, 2003, Manager Higginbotham sent plaintiff a Notice of Proposed Placement on Enforced Leave, notifying him that he was placed on Enforced Leave Status effective December 23, 2002.  Higginbotham's letter further notified plaintiff that since he was claiming a medical reason for not being fit to work, his physician needed to complete a return to work form.  If his enforced leave status went beyond 14 days, he may have the right to appeal to the Merit Systems Protection Board.

24.    On or about January 27, 2003, Manager Higginbotham received a memorandum from Ann Tholen, OHNA, which released plaintiff to work.  The memorandum notes that plaintiff was released to return to work without restrictions on January 8, 2007; however "[R]elease was held for further documentation" until January 27.

25.    On or about January 28, 2003, Manager Higginbotham notified plaintiff via letter that he had been medically cleared to return to work effective January 29, 2003.

26.    On or about April 8, 2003, plaintiff tripped and fell on a fatigue mat while working in the CFS Unit.  Supervisor Zarkoskie immediately went over to the area and found plaintiff walking around, holding his back.  Plaintiff told Supervisor Zarkoskie that he was carrying a tub of mail and the front of his boot caught the end of the mat, causing the fall.  Supervisor Zarkoskie accompanied plaintiff to Midwest Minor Medical and completed a PS Form 1769, Accident Report.

27.    Dr. Alexandra Geditz at Midwest Minor Medical diagnosed plaintiff with a back strain and prescribed Naproxen and Norflex.  Dr. Geditz advised plaintiff that he could return to work on April 8, 2003, and perform his regular duties within specified restrictions.

-10-

28.   Following the appointment, plaintiff told Supervisor Zarkoskie that he wanted to see his own doctor.  Supervisor Zarkoskie provided plaintiff with the appropriate forms to be completed by his doctor.

29.   On April 8, 2003, plaintiff applied for COP by submitting a Notice of Traumatic Injury and Claim for Compensation, Department of Labor form CA-1.

30.   On or about April 9, 2003, the CFS unit was provided documentation from plaintiff's treating physician, Dr. Ron Silvius which recommended that plaintiff stay on bed rest for 48 hours, followed by a period of very restricted activity.

31.   On or about April 8, 2003, a Postal Service supervisor contacted Jim Murcek, Postal Inspector, United States Postal Inspection Service because plaintiff had submitted two conflicting doctor's opinions regarding whether plaintiff could return to work.

32.   On April 10 and 11, 2003, Inspector Murcek conducted surveillance of plaintiff's acreage.  Plaintiff drove a tractor out to the pasture and got on and off the tractor several times. Plaintiff, with the assistance of another male, maneuvered a circular 10 foot metal horse trough onto the back of the tractor by lifting it onto its side and rolling it into position.  Plaintiff was observed walking, bending, reaching, twisting, and lifting.  Plaintiff wore boots that came up to his knees. Plaintiff was also seen walking from his residence to his mailbox, located approximately one block away, and back.  Murcek obtained the plaintiff's medical records by a subpoena issued by the Office of the Inspector General.  The records included communications from the plaintiff to his doctors directing them how to respond to specific questions.

-11-

33.    On or about April 14, 2003, plaintiff contacted Manager Higginbotham and told her that he could return to work the next day, but needed to wear open toed sandals because his foot was swollen and he could not get a shoe on.  Manager Higginbotham reminded plaintiff of the Postal Service's safety policy on footwear, which requires employees to wear closed toe leather or leather-like shoes.  Plaintiff provided medical documentation which stated, "Elevate feet as necessary, pt. may wear sandals."  Manager Higginbotham checked with the Injury Compensation Office, the Safety Office, and her supervisor who all stated that plaintiff should not be in the facility with sandals.

34.    On or about April 17, 2003, plaintiff returned to work in the CFS Unit.

35.    On April 21, 2003, Inspector Murcek interviewed Dr. Silvius who stated that he was not aware that a doctor had previously released plaintiff back to work with limited restrictions; that he was not surprised that plaintiff was observed feeding his horses when he was supposed to be on 48 hours of bed rest; that plaintiff was very demanding during his follow-up appointment on April 14, 2003; that plaintiff told him he had a hard time putting shoes on and asked him to indicate that he could wear sandals to work; that plaintiff left the office on April 14, 2003, and later returned to ask Dr. Silvius to change the neuropsychological section on the form and to designate keyboarding as a strenuous activity.  Dr. Silvius told Inspector Murcek that he changed the form as requested; that plaintiff returned to his clinic on April 15, 2003, was very belligerent and angry, and threatened him with a malpractice suit; and that because of this and plaintiff's past experiences with other doctors in the Glenwood Clinic, he and the other doctors did not want plaintiff back in the clinic.

-12-

36.     Supervisor Zarkoskie discussed plaintiff's April 8, 2003, injury with the Labor Relations Office and the Safety Office.  Due to the cause of the injury, including the fact that plaintiff caught the toe of his shoe on the mat and was not walking heel to toe, as the Postal Service instructs all employees, the Safety Office classified it as an "accident" as opposed to an "incident."

37.     On or about May 1, 2003, Safety Manager Ellen Fischman provided Supervisor Zarkoskie with a report listing plaintiff's accident record with the Postal Service.  The report showed that in the previous five years, plaintiff had two vehicle accidents and three other industrial accidents.

38.     On or about May 5, 2003, Supervisor Zarkoskie issued a Letter of Warning to Plaintiff for unacceptable conduct as a result of tripping over the mat on April 8, 2003.  Supervisor Zarkoskie's decision to issue the Letter of Warning was based on the facts of the accident and plaintiff's past accident history.  Plaintiff's medical condition(s), impairments, race, age, sex, or the fact that he had engaged in prior EEO activity were not factors in the decision to issue the Letter of Warning.

39.     On or about May 23, 2003, Supervisor Zarkoskie settled plaintiff's grievance on the May 5, 2003 Letter of Warning during Step 1 of the grievance process.

40.     On or about May 7, 2003, the OWCP denied plaintiff's April 8, 2003 claim for compensation.  This decision was upheld on appeal and upon reconsideration.

41.     On or about July 8, 2003, Manager Higginbotham received a copy of the Investigative Memorandum issued by Inspector Murcek relating to plaintiff.  The Investigative Memorandum stated that plaintiff was performing routine chores, which included the activities of walking, bending,

twisting, and lifting, on his acreage at a time he was claiming he could not be at work at the Post Office because his doctor restricted him to 48 hours of bed rest.

42.     On July 15, 2003, Manager Higginbotham discussed the findings contained in the Investigative Memorandum with plaintiff and asked him if he had performed any activities outside of the 48 hour bed rest restriction.  Plaintiff replied that he "had to feed my horses, I ate, I drank, I used the restroom, I sat, I stood, and I walked."

43.     After consulting with the Labor Relations Office, Postmaster EvaJon Sperling, and her supervisor Leonard Whiteing, Manager Higginbotham submitted a Disciplinary Action Proposal to her supervisor on or about July 17, 2003.  Manager Higginbotham recommended that plaintiff be issued a Letter of Removal.  Mr. Whiteing concurred with the recommendation.

44.     On or about August 8, 2003, Manager Higginbotham issued plaintiff a Notice of Proposed Removal based on the charge: "Exaggeration of your complaints of physical injury for the purpose of improperly requesting Injury Compensation and/or other benefits."  Plaintiff's medical condition(s), impairments, race, age, sex, or the fact that he had engaged in prior EEO activity were not factors in Manager Higginbotham's decision to issue the Notice of Proposed Removal.  This type of action did not require progressive discipline according to Article 16 of the Collective Bargaining Act; therefore Manager Higginbotham was able to directly issue the Notice of Removal without going through the typical progressive discipline structure.

45.     On or about April 27, 2004, the Union and a Postal Service representative entered into a pre-arbitration settlement regarding plaintiff's Notice of Proposed Removal.  The parties agreed that the proposed removal be reduced to a 30-day time-served suspension which was to be expunged

from plaintiff's Official Personnel File on August 7, 2004, provided he incurred no further disciplinary action before that date.  Plaintiff was reimbursed all back pay and benefits, less back pay and benefits for the 30 days.

46.    On or about May 11, 2004, plaintiff was reinstated to the CFS unit.  He did not file this action until January 3, 2006.

47.    On or about December 6, 2000, plaintiff was notified of a debt he owed to the Postal Service in the amount of $380.84.  This debt arose from a salary overpayment for pay periods 2 through 13 of the year 2000.  Plaintiff repaid this debt via payroll deduction beginning January 5, 2001, at $50.00 per pay period for seven pay periods with an additional final payment of $30.84 made via payroll deduction on April 13, 2001.  This debt has a zero balance.

48.    On or about January 29, 2003, plaintiff was notified that the cost to buy back leave he requested between 11/9/1999 and 3/1/2002 would be $2,190.37.  This debt was repaid with the Department of Labor making a payment in the amount of $1,716.25, and plaintiff making two payments totaling $474.12.  This debt has a zero balance.

### III.  CONCLUSIONS OF LAW

#### A.    Summary Judgment Standard

Under Fed. R. Civ. P. 56, summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Devin v. Schwan's Home Service, Inc.*, 491 F.3d 778, 785 (8th Cir. 2007).  "In making this determination, the function of the court is not to weigh evidence and make credibility determinations,

or to attempt to determine the truth of the matter, but is, rather, solely, to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The court must "look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997) (quoting *Anderson*, 477 U.S. at 248).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact. *See Tenbarge v. Ames Taping Tool Sys., Inc.*, 128 F.3d 656, 657-58 (8th Cir. 1997); NECivR 56.1(a).

In the face of a properly supported motion, "[t]he burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998) (quoting Fed. R. Civ. P. 56(e)). A nonmoving party may not rest upon the mere allegations or denials of its pleadings, but rather, must set forth specific facts, supported by affidavits or other proper evidence, showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919, 922 (8th Cir. 1998). In this respect, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts;' ... [i]t must show there is sufficient evidence to support a jury verdict in [its] favor." *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir. 1998); *see* NECivR 56.1(b).

-16-

### B.     Plaintiff's Arguments

The plaintiff alleges he is entitled to relief under Title VII, the FMLA, and the Rehabilitation Act of 1973 because the Postal Service

- forced him to work at the CFS Unit,

- would not allow him to return to work on January 6, 2003,

- issued a Letter of Warning on May 5, 2003 for unacceptable conduct as a result of tripping over the mat on April 8, 2003,

- placed him under observation by the Postal Inspector while he was on medical leave in April 2003, thus violating his "medical privacy,"

- disciplined him while he was on medical leave; and

- calculated his indebtedness, as a "disabled" employee, differently than that of other employees with respect to buying back annual leave or sick leave.

These acts, it is alleged, were made in retaliation for plaintiff's exercising his rights as a postal employee.

In considering the plaintiff's claims and arguments, the court has heeded the Supreme Court's directive that court documents filed pro se must be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers. *See, e.g., Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007); *Haines v. Kerner*, 404 U.S. 519 (1972).

### 1.   Title VII

Title VII generally prohibits discrimination in employment based on an individual's race, color, religion, sex, or national origin.  *See* 42 U.S.C. §§ 2000e-2 , 2000e-3 & 2000e-16 ("All personnel actions affecting employees or applicants for employment ... in the United States Postal

Service ... shall be made free from any discrimination based on race, color, religion, sex, or national origin.").

Liberally construing the plaintiff's pro se complaint and motion for summary judgment, the court can find no indication that the plaintiff seriously claims the Postal Service committed any unlawful act of discrimination based on his race, color, religion, sex, or national origin. Since the plaintiff does not appear to seek relief for any practice prohibited by Title VII, summary judgment will be granted in favor of the Postal Service on all claims premised on a violation of Title VII. *See, e.g., King v. Jackson*, 468 F. Supp. 2d 33, 37-38 (D.D.C. 2006), *aff'd*, 487 F.3d 970 (D.C. Cir. 2007).

### 2. Rehabilitation Act Claims

The Rehabilitation Act provides, "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, ... be subjected to discrimination ... under any program or activity conducted by ... the United States Postal Service." 29 U.S.C. § 794(a). To prove any claim under the Rehabilitation Act, the plaintiff must show he was "disabled," was "otherwise qualified," and was the victim of "discrimination" "solely" because of his disability. *Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004). Section 705 of the Rehabilitation Act defines disability as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such impairment; or being regarded as having such an impairment." 29 U.S.C. § 705(9)(B); *Berkey v. Henderson*, 120 F. Supp. 2d 1189 (S.D. Iowa 2000).

Specifically, to prove a claim of retaliation under the Rehabilitation Act, the plaintiff must show (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between (1) and (2).

-18-

The Postal Service does not concede that the plaintiff has a "disability" within the meaning of the Rehabilitation Act. Assuming, without deciding, that plaintiff was disabled, and that plaintiff's acts constituted "protected" activities[4], there is no evidence in the record that tends to establish that the actions taken by the Postal Service were acts of unlawful retaliation. The plaintiff was offered, and accepted, a full time job at the CFS Unit because the CFS Unit could accommodate his medical restrictions. His assertions that other employees resented his receiving certain incentives for taking the position do not constitute a "hostile work environment" for purposes of an employment discrimination claim.

Throughout his tenure at the CFS Unit, the plaintiff was involved in or instigated many petty disputes with coworkers, impeding productivity and providing just cause for any rational supervisor to take some kind of corrective action. In the five years prior to the April 2003 incident, plaintiff had two vehicle accidents and three other industrial accidents. Based on the facts of the accident and his poor record, plaintiff was issued a Letter of Warning for unacceptable conduct as a result of tripping over the mat on April 8, 2003. The court finds that the actions of the Postal Service taken in response to the plaintiff's conduct in the workplace were reasonable and were not unlawfully retaliatory.

Turning to plaintiff's complaint that his rights were violated because he was not allowed to return to work on January 8, 2003, the record shows that plaintiff's December 6, 2002 COP request contained a statement that fell within the scope of the Postal Service's Zero Tolerance Policy. Plaintiff was advised several times of the documentation he needed to submit before he would be

---

[4]By making these assumptions, the court is not making any determination that the plaintiff was or was not disabled or that he did or did not engage in protected activities.

allowed to return to work.  He was returned to work virtually immediately after he belatedly provided the required documentation.

In summary, there is absolutely no evidence that the Postal Service took any adverse action against the plaintiff  solely by reason of a "disability," and summary judgment will be granted in favor of the Postal Service on all claims premised on violations of the Rehabilitation Act.

### 3.  Claims under the FMLA; Medical Privacy

The FMLA provides eligible employees up to 12 work weeks of unpaid leave in any 12-month period and prohibits employers from discriminating against employees for exercising their rights under the Act.  *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2000) (citing 29 U.S.C. §§ 2612, 2615(a)(2)).  To establish a prima facie case of retaliation under the FMLA, the plaintiff must show that he exercised rights afforded by the FMLA, and suffered an adverse employment action, and that there was a causal connection between her exercise of rights and the adverse employment action.  *Id.*

These claims appear to be based on the events which occurred on and after the incident on April 8, 2003, when plaintiff tripped and fell on the fatigue mat.  Shortly after the fall, plaintiff received medical care from Dr. Alexandra Geditz, who diagnosed plaintiff with a back strain, prescribed medication, and told plaintiff that he could return to work immediately that day and perform his regular duties within specified restrictions.

Plaintiff insisted on being examined by his own doctor, Dr. Ron Silvius.  Dr. Silvius recommended that plaintiff stay on bed rest for 48 hours, followed by a period of very restricted

-20-

activity.  Dr. Silvius made this recommendation based solely on information provided by the plaintiff and was not aware of Dr. Geditz' prior diagnosis.

Because of the conflicting medical reports, the Postal Investigator was asked to conduct an investigation.  The Postal Inspector conducted surveillance of the plaintiff and recorded plaintiff performing strenuous physical activity during the 48-hour period he was instructed to stay on bed rest.  Inspector Murcek also obtained the plaintiff's medical records by a subpoena issued by the Office of the Inspector General.  The subpoena was properly issued pursuant to the Inspector General Act of 1978, 5 U.S.C. App. 3, §§ 1-12.  *See, e.g., Rhoades v. United States*, 953 F. Supp. 203 (S.D. Ohio 1996).  The records included instructions from the plaintiff to his doctors telling them how to respond to specific questions, and the Postal Inspector believed plaintiff had threatened his doctors.

Here, the record conclusively shows that the Postal Inspector's investigation of his activities and the procurement of plaintiff's medical records in April 2003 were not motivated by the exercise of plaintiff's rights under the FMLA.  Rather, the Worker's Compensation fraud investigation was conducted, justifiably, due to the conflicting medical reports of the plaintiff's alleged injury.  The court finds that plaintiff has failed to establish a prima facie case of retaliation under the FMLA.

To the extent plaintiff contends he is entitled to relief under the FMLA because he was put on Emergency Placement, Off-Duty Status and not allowed to return to work until cleared by a physician/psychiatrist, the court finds such a claim to be without merit for the reasons discussed with respect to his Rehabilitation Act claims.

In the alternative, the court finds that plaintiff's FMLA claims are barred by the statute of limitations.  Under the FMLA, a plaintiff must file suit within two years after the date of "the last

-21-

event constituting the alleged violation." *See* 29 U.S.C. § 2617(c)(1).  In the case of a "willful"

violation, the limitations period extends to three years.  29 U.S.C. § 2617(c)(2).  The evidence does

not support any allegation that the Postal Service committed any violation, much less a willful

violation, of the FMLA in this case.  The incidents complained of occurred more than two years

before plaintiff filed this action on January 3, 2006, and are, therefore, time barred.  29 U.S.C. §

2617(c)(1).

### 4.  Other Claims

Plaintiff contends the Postal Service discriminated against him by calculating the

indebtedness of disabled employees, including the plaintiff, differently than the indebtedness of other

employees.  The Postal Service has shown that any "indebtedness" of the plaintiff was ultimately

determined by the OWCP, not the Postal Service.  Nor is there any evidence that anyone's

indebtedness was calculated by anybody on the basis of disability.

### IV.  DECISION

In summary, the plaintiff has not challenged any employment practice that is prohibited by

Title VII.  There is no evidence that the Postal Service took any adverse action against the plaintiff

solely by reason of a "disability."  The Postal Service acted reasonably in placing the plaintiff on

Emergency Placement, Off-Duty Status and not allowing him to return to work without the required

medical documentation. The Postal Service also acted reasonably in requesting an investigation of

plaintiff's Worker's Compensation claim for the April 8, 2003 incident.  The May 5, 2003 Letter of

Warning issued as a result of the April 8, 2003 incident was not issued for any reason related to the

plaintiff's purported disability.  Plaintiff's claims under the FMLA are barred by the statute of

-22-

limitations. Plaintiff has failed to provide any evidence of employment discrimination related to any calculation of his indebtedness.

For all the reasons discussed in this Memorandum and Order, the court finds and concludes that the Motion for Summary Judgment filed by the Postal Service should be granted in its entirety, and that the plaintiff's responsive Motion for Summary Judgment should be denied.

**IT IS ORDERED:**

1. Defendant's Motion for Summary Judgment (Filing 58) is granted.

2. Plaintiff's Motion for Summary Judgment (Filing 64) is denied.

3. Pursuant to this Memorandum and Order, judgment will be entered in favor of the defendant and against the plaintiff.

**DATED October 5, 2007.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**